IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| David C. Poole, | ) | Civil Action No.: 6:12-2943-BHH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| Transcontinental Fund Administration, Ltd., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on the defendant Transcontinental Fund Administration, Ltd.'s ("the defendant") Renewed Motion to Dismiss (ECF No. 36), and the plaintiff David C. Poole's ("the plaintiff") motion to amend complaint (ECF No. 37) and motion to strike sur reply brief (ECF No. 50). The case was removed from the Court of Common Pleas, County of Greenville, South Carolina on October 11, 2012, by the defendant. (ECF No. 1.) In his Complaint, the plaintiff assert causes of action for breach of fiduciary duty, breach of contact, and breach of contract accompanied by a fraudulent act. The plaintiff moves to add new causes of action for violations of S.C. Code Ann. Section 35-1-509 of the Couth Carolina Uniform Securities Act. (ECF No. 37-2.)

Previously the parties were allowed leave to conduct discovery concerning whether or not the Court could exercise personal jurisdiction over the defendant. That discovery having been completed for some time, the matter is appropriate for consideration.

**FACTUAL AND PROCEDURAL BACKGROUND**

The defendant is a company organized and existing under the laws of the Cayman Islands, British West Indies (Compl. ¶ 2; Woerheide Aff. ¶ 3), but has two offices – one in Chicago and one in the Cayman Islands. Starting in January 2008, the plaintiff invested

some funds with an investment fund, started by Rod McGee, named Congaree Capital, LP. The defendant was the Fund Administrator for Congaree Capital. Congaree Capital, LP operated domestically within the United States in all respects.  The main office for Congaree Capital was McGee's office in Greenville, South Carolina.

It is undisputed that during the spring and summer of 2009, McGee began setting up a sister fund to Congaree Capital, LP, called Congaree Offshore Capital, Ltd. ("Congaree Offshore").  McGee also set up a master fund called Congaree Master Fund, LP, which received funds from both Congaree Offshore and Congaree Capital, Ltd. (Pl. Ex. 6.) McGee again hired the defendant as the administrator for the new Congaree Offshore fund and Congaree Master Fund, LP. (Woerheide Dep. at 26–29, 139.)

The defendant agreed to assist McGee and Congaree Offshore in setting up Congaree Offshore and Congaree Master Fund, LP. (Woerheide Dep. at 54-55.) As part of the creation of Congaree Offshore, the defendant worked with McGee and his Georgia securities lawyer, Gilbert Davis, to help with the formation of Congaree Offshore from March through May, 2009. (Woerheide Dep. at 54.) On May 27, 2009, the defendant produced and emailed a draft Fund Administration Agreement ("the Agreement") to Rod McGee in Greenville, South Carolina. (Woerheide Dep. at 115; Pl. Ex. 2 at TFA 03007-08). As part of the launching of the new fund, McGee and Congaree Offshore through their attorney prepared a document called the "Private Offering Circular" to be issued to all potential investors. The defendant received, reviewed, and revised multiple drafts of the Private Offering Circular prior to its issuance. (Woerheide Dep. at 83-88, 91; Pl. Ex. 2 at TFA 01559, 03087).  The correspondence always reflected that McGee operated out of Greenville, South Carolina. (Pl. Ex. 2 at TFA 02991.)

On June 26, 2009, McGee emailed the plaintiff the Private Offering Circular for Congaree Offshore which contained the representation that the defendant would inform shareholders of significant events, which representation the defendant had previously reviewed. (Pl. Ex. 3 at McGee 000029.) The email also enclosed the Subscription Agreement and Revocable Proxy for the plaintiff to sign as well as other account opening documents. *Id*. The instructions directed that originals of the signed documents were to go to the defendant. *Id*. That same day the plaintiff signed the Subscription Agreement and returned it to McGee along with notarized copies of the plaintiff's driver's license and power bill as required for the signing process. (Pl. Ex. 3 at McGee 166-67.) On June 26 and 29, two other South Carolina individuals executed and submitted Subscription Agreements similar to those submitted by the plaintiff for purchases of shares in Congaree Offshore. (Pl. Ex. 2 at TFA 00848, 00884.) On June 29, 2009, the three South Carolina Subscription Agreements in Congaree Offshore were emailed by McGee to the defendant. (Pl. Ex. 2 at TFA 01318, 1320 and 1321.)

On June 30, 2009, the Fund Administration Agreement was subsequently signed by the defendant, with a contract signature date of June 30, 2009. Ultimately only four people invested in Congaree Offshore, all of whom were South Carolina-based individuals. They consisted of three South Carolina residents and an associate of McGee who the defendant knew worked in McGee's Greenville, South Carolina office but resided in North Carolina. (Pl. Ex. 2 at TFA 402; Woerheide Dep. at 25.)

The plaintiff emphasizes that over the course of the formation of the Congaree Offshore fund and the entering into the Fund Administration Agreement, the defendant sent or received hundreds of emails, faxes or other communications with South Carolina

persons. (Pl. Ex. 5.)

The plaintiff alleges that subsequent to his investment the defendant breached various promises made in the Agreement and Private Offering Circular related to information regarding the value of his investment.

## **STANDARD OF REVIEW**

A plaintiff's complaint should set forth "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). To show that the plaintiff is "entitled to relief," the complaint must provide "more than labels and conclusions," and "a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. In considering a motion to dismiss under Rule 12(b)(6), the Court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff . . . ." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir. 2009). Notably, "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement" do not qualify as well pled facts.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must state "a plausible claim for relief." *Iqbal*, 129 S. Ct. at 1950. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557). Stated differently, "where

-4-

the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*. (quoting Fed. R. Civ. P. 8(a)). Still, Rule 12(b)(6) "does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Colon Health Centers of Am., LLC v. Hazel*, 733 F.3d 535, 545 (4th Cir. 2013) (quoting *Neitzke v. Williams,* 490 U.S. 319, 327 (1989)). "A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss . . . ." *Sepulveda-Villarini v. Dep't of Educ. of Puerto Rico*, 628 F.3d 25, 30 (1st Cir. 2010) (Souter, J.).

The standard for motions pursuant to Federal Rule of Civil Procedure 12(b)(2) will be discussed below.

## **DISCUSSION**

This case is already tortured procedurally. And, while the undersigned has only more recently become responsible for it, the Court would express regret that docket circumstances beyond the Court's control could not have allowed for a more timely resolution of the present motion to dismiss. The Court would finally resolve the jurisdictional issue, in this Order, but would largely delay for future consideration other legal issues raised, most notably in the motion to amend and related response. In an attempt to advance the case, the Court would at this time permit amended claims and allow the substance of the case to proceed, even over arguments made, as a matter of law. They may be later renewed.

The Court will first consider the defendant's motion to dismiss based on three grounds: (1) lack of personal jurisdiction; (2) improper forum; and (3) failure to state a claim. The Court would then briefly consider the plaintiff's motions to amend and strike.

-5-

**I.     Motion to Dismiss**

    **A.     Personal Jurisdiction**

The defendant rejects that the Court can exercise any personal jurisdiction over it. For the following, the Court believes it can. Rule 12(b)(2) of the Federal Rules of Civil Procedure is applicable to motions to dismiss for lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2). "When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff ultimately bears the burden of proving to the district court judge the existence of jurisdiction over the defendant by a preponderance of the evidence." *New Wellington Fin. v. Flagship Resort Dev.*, 416 F.3d 290, 294 (4th Cir. 2005). Where, however, a court addresses the question solely on the basis of "motion papers, supporting legal memoranda and the relevant allegations of a complaint," the plaintiff's burden "is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." *Id*. In evaluating the plaintiff's showing, "the court must take all disputed facts and reasonable inferences in favor of the plaintiff." *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). Here, however, jurisdictional discovery has been allowed and the plaintiff, therefore, must show that jurisdiction actually exists. *See Brown v. Geha-Werke GmbH*, 69 F. Supp. 2d 770, 774 (D.S.C.1999) (citing *Combs v. Baker,* 886 F.2d 673, 676 (4th Cir. 1989)).

The Due Process Clause of the Fourteenth Amendment to the United States Constitution is satisfied for personal jurisdiction purposes if a defendant has "purposefully availed itself of the privilege of conducting business in the forum state" by establishing sufficient "minimum contacts such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Burger King Corp v. Rudezewicz*, 471 U.S.

462, 475-76 (1985); *see also International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The initial inquiry, whether the defendant established minimum contacts with the State, remains the threshold determination and constitutional touchstone for establishing jurisdiction. *See Burger King,* 471 U.S. at 474. Courts also consider whether "the defendant has 'purposely directed' his activities at residents of the forum state." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984). "The 'purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous' or 'attenuated' contacts 'or of the unilateral activity of another party or thirdperson.'" *Burger King*, 471 U.S. at 475 (internal citations omitted). "Jurisdiction is proper, however, where the contacts proximately result from the action by the defendant himself that create a 'substantial connection' with the forum state." *Id*. at 475.

There are two types of personal jurisdiction, "general" and "specific." General jurisdiction arises out of a defendant's "enduring relationship with the forum state," and his connection to and activities in the forum. *Global Tech. Int'l, Ltd. v. Cont'l Auto. Sys., Inc.*, 2013 WL 1809773 (D.S.C. Apr. 29, 2013) (citing S.C. Code Ann. § 36–2–802). Activities giving rise to general jurisdiction need not be related to the alleged acts or omissions giving rise to the action, but must be sufficiently involved or enduring that the defendant would reasonably "expect to be subject to suit" within the jurisdiction on "any claim" and "would suffer no inconvenience from defending there." *Gossett v. HBL, LLC*, 2006 WL 1328757 (D.S.C. May 11, 2006). Thus, general jurisdiction requires a showing that "the defendant's activities in the state" were "continuous and systematic." *Carefirst of Maryland, Inc.*, 334 F.3d at 397 (quotation marks and citation omitted).

In contrast to general jurisdiction, specific jurisdiction arises where "the defendant's

-7-

contacts with the forum state also provide the basis for the suit." *Id*. The South Carolina Supreme Court analyzes specific jurisdiction in a two-step process, first examining the applicability of specific subsections of the South Carolina long arm statute and then examining whether jurisdiction violates the due process clause. *See S. Plastics Co. v. S. Commerce Bank*, 423 S.E.2d 128, 130 (S.C. 1992). However, because the South Carolina Supreme Court has held that the South Carolina long arm statute is deemed to reach "the outer limits of due process," federal courts normally conduct a single inquiry under the due process clause. *See Fed. Ins. Co. v. Lake Shore, Inc.*, 886 F.2d 654, 657 n. 2 (4th Cir.1989). "A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has 'minimum contacts' with the forum, such that to require the defendant to defend its interests in that state 'does not offend traditional notions of fair play and substantial justice.'" *Carefirst of Maryland, Inc*., 334 F.3d at 397 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). To determine whether specific jurisdiction exists, courts consider "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Unspam Technologies, Inc. v. Chernuk*, 716 F.3d 322, 328 (4th Cir. 2013) (quotation marks and citation omitted).

The parties spend a lot of energy debating the online conduct of the defendant and whether it justifies the exercise of personal jurisdiction in this case, general or specific. But, to the undersigned, this case does not turn on the quantity or quality of either passive internet activity or ancillary electronic communication. To the Court, this is not an *ALS Scan, Inc., v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2009)-type case.

The defendant engaged in a specific business enterprise in the State of South Carolina from which the claims in this action eventually arose.  The plaintiff was not simply and incidentally swept up in a broad, indiscriminate net of the defendant's international commerce.  The jurisdiction is specific.  Contrary to its claim that its only conceived role was as a passive administrator, the defendant did much more than just assist in post-sales administrative matters. It was involved in developing the representations that would be necessary to sell the securities to purchasers like the plaintiff, in South Carolina.  Whether those specific representations were marketing or technical in nature, as the defendant would quibble, seems not very relevant.  The defendant affirmatively engaged and assisted a South Carolina business who likely would generate South Carolina clientele, like the plaintiff.  This is purposeful availment and constitutionally reasonable to defend here.

Under multiple theories, the plaintiff has sued the defendant for the breach of the Fund Administration Agreement and misrepresentations in its Private Offering Circular. (See Compl. ¶¶ 32-34, 41, 43.)  Although not necessary to conclude, the Agreement's execution and Congaree Offshore's performance constitute the "entry into a contract to be performed in whole or in part by either party in this State" in accordance with South Carolina's Long Arm Statute.  S.C. Ann. § 36-2-803(7); see *Moosally v. W.W. Norton & Co., Inc.*, 358 S.C. 320, 331, 594 S.E.2d 878, 884 (Ct. App. 2004) (stating minimum contacts requires a court to find defendant directed its activities to resident of South Carolina and that cause of action arises out of or relates to those activities) (citing *Burger King Corp.*, supra).

The defendants conduct with respect to the Fund Administration Agreement was purposely directed at South Carolina and is a part of the epicenter of the claims at issue.

On May 27, 2009, the defendant produced and sent to Rod McGee a draft Fund Administration Agreement. (Pl. Ex. 2 at TFA 03007-08.) After some semantics during her deposition, Claudia Woerheide, the defendant's Fed. R. Civ. P. 30(b)(6) deponent, testified she sent the Agreement to McGee for signature knowing he worked in South Carolina. (Woerheide Dep. at 116.) On June 9, 2009, McGee responded that he was out on vacation and would sign the next week. (Pl. Ex. 2 at TFA 03007.) On June 24, 2009, the defendant informed McGee, by e-mail to his South Carolina e-mail address, that it was not undertaking the requested administrative support until McGee signed the contract. (Pl. Ex. 2 at TFA 01608; Ex. 1 - Woerheide Dep. 98-100.) Two days later on June 26, 2009, McGee e-mailed to the defendant a contract signed by him for Congaree Offshore. The contract had not yet been signed by Transcontinental. Subsequently on or about June 30, 2009, by contract dated June 30, 2009, Transcontinental countersigned the Fund Administration Agreement with its South Carolina client. (ECF # 6-4, pg. 10).

      The defendant expressly directed its conduct toward South Carolina. Whether or not it chose to be somehow willfully ignorant of the precise geographic territory in which it was operating, the Court cannot say. But, it was plainly availing itself of a business relationship existing in a specific somewhere and to which it should reasonably have expected litigation for the benefit of having done so and for any injury arising therefrom. That specific somewhere happened to be South Carolina, a fact readily knowable.

      More critical to the Court's view of the jurisdictional analysis is the defendant's affirmative participation in the development of the Private Offering Circular, distributed to prospective clients, including the plaintiff, for participation in the fund. McGee, manager of Congaree Offshore, a South Carolina-based company, sold the Congaree Offshore

securities to the plaintiff, by his offer to the plaintiff, on June 26, 2009, and by the plaintiff's acceptance in signing the Subscription Agreement the same day. Importantly, McGee's offer included the submission of the Private Offering Circular. (Pl. Ex. 3 - McGee 000029-30.) The plaintiff alleges that, with the defendant's assistance and knowledge, the Private Offering Circular contained material misstatements that the defendant would inform shareholders of the occurrence of material events and would provide investors a valuation on the last business day of the month. (Compl. ¶¶ 32-34.) The evidence indicates that the Private Offering Circular was drafted with the defendant's affirmative assistance. Woerheide testified that she generally reviewed draft versions of the Private Offering Circular prior to their issuance to investors. (Woerheide Dep. at 83.) She stated she would review parts of the Private Offering Circular including the Investment Objectives to make sure the defendant was not held responsible. (Woerheide Dep. at 84-85.) Critically, she stated she also intended to review any language that mentioned the defendant, *id*. at 87, and that "[t]ypically, I would read everything . . .," *id*. at 88.

On May 22, 2009, Woerheide e-mailed both McGee, in South Carolina, and his attorney with comments on changes to the Private Offering Circular to be offered to investors. (Pl. Ex. 2 at TFA 01559.) She attached a redlined version of the Private Offering Circular with her comments on proposed changes in her response to McGee and his attorney. *Id*. Significantly, in her May 22, 2009 e-mail about her latest review of the Private Offering Circular, she stated "I hope that this meets both Rod's and your expectations . . . ." *Id*. The defendant, McGee, and McGee's attorney exchanged numerous additional correspondence concerning the Circular. (Pl. Ex. 2 at TFA 01571; Woerheide Dep. at 96.) In short, the defendant intended to materially aid the seller/offeror

-11-

of the securities sold to the plaintiff in South Carolina. Again, whether the defendant purposefully or even incidentally declined to know the location of its business partner is not material; these are not e-mail blasts to thousands of customers nationwide or the presence of a passive web domain, accessible to all. These interactions are purposeful, substantive, and directed at the State of South Carolina.

Moreover, these drafts of the Private Offering Circular which the defendant received, reviewed, and sent back to its South Carolina client, contained the various and precise misrepresentations alleged and proposed by the plaintiff. (Compl. ¶¶ 32-34; Prop. Am. Compl. ¶ 42(d),(e)).

The Fourth Circuit has found purposeful availment where a defendant substantially collaborated with a forum resident and that joint enterprise constituted an integral element of the dispute. *See Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 302 (4th Cir. 2012). It was the correspondence between the defendant and McGee that formed "an important part of the plaintiff's claim, another factor central to [the Fourth Circuit's recommended] analysis . . . ." *Id*. at 304. Although the defendant had no physical presence in the forum, it engaged in limited but "substantive deliberations" related to the claims in this case. *Id*. at 306.

The Court is not confused either by the volume of documentation submitted by the plaintiff nor the defendant's dealings with the Congaree Onshore fund, as the defendant warns. The Court has focused on these limited interactions concerning the offshore fund, which, as a matter of law, are enough. Fairness is the touchstone of the jurisdictional inquiry, and the "'minimum contacts' test is premised on the concept that a corporation that enjoys the privilege of conducting business within a state bears the reciprocal obligation

of answering to legal proceedings there." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 293 (4th Cir.2009). In the context of specific jurisdiction, "the relevant conduct [must] have [only] such a connection with the forum state that it is fair for the defendant to defend itself in that state." *Id*. at 292 n.15. As the parties both iterate, the jurisdictional inquiry requires something more than "formulaically count contacts," and the Court, instead, must take into account the qualitative nature of the defendant's connections to the forum state. *Id*. In that vein, "a single act by a defendant can be sufficient to satisfy the necessary 'quality and nature' of such minimal contacts, although 'casual' or 'isolated' contacts are insufficient to trigger" an obligation to litigate in the forum. *Id*. at 293 (quoting *Int'l Shoe Co.,* 326 U.S. at 317-18). The Court is comfortable that the qualitative nature of the defendant's conduct was a purposeful and directed availment towards business in South Carolina.

The defendant contends that there is no evidence that it ever intended Offshore Fund investors to be South Carolina residents. It emphasizes the testimony Woerheide that the Offshore Fund was established with the intention of courting foreign investors:

> Q: When Mr. McGee or, perhaps Mr. Weatherly was discussing the offshore fund with you, was it your understanding that they intended for this fund to be offered to non-United States residents?
>
> A: Absolutely.

(Woerheide Depo. at 181-182; see also Woerheide Dep. at 75 ("The intention why the offshore fund was created was because I was told that there was an expansion going on, and a marketing effort from the management group to bring in foreign investors. That was the idea."), 90 ("[B]ecause the fund was intended for foreign investors and for tax-exempt

investors, whoever that is."), 149.)

But, the Court is somewhat confused by the position. Such an intent does not preclude the commensurate likelihood that South Carolina clients of McGee's South Carolina investment company would also invest. The evidence emphasizes that the defendant's business relationship with McGee contemplated South Carolina clientele. No matter what the general marketing goal of the fund, (Woehreide Dep. at 181-82), there was a specific interaction directed towards a South Carolina business engaged in procuring investments among South Carolina investors. Indeed, there is specific evidence that the defendant knew and should have so anticipated. At the time the contract was signed by the defendant, it knew that Congaree Offshore had 3 investors, all of whom were South Carolina residents. (Pl. Ex. 2 at TFA 00056, 000403.) The day before the defendant signed the contract, it received from McGee the subscription agreements of all three subscribers which showed they were South Carolina residents. (Pl. Ex. 2 at TFA 00056, 000403.) 71% of the investors in Congaree Capital, L.P., Congaree Offshore's sister fund, which the defendant also administered, were South Carolina residents (20 of 29 investors). (See Pl. Ex. 2 at TFA 00405- 07.) The marketing base of McGee and Congaree Offshore was obviously South Carolina, and the defendant elected to enter into a service contract with it. The resulting services and communications provided by the defendant, which went exclusively to South Carolina-based investors, were, therefore, not some "random" or "fortuitous" result. *See Burger King*, 471 U.S. at 475 (holding " 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts"); *see also Manley v. Air Canada*, 753 F. Supp.2d 551, 560 (E.D.N.C. 2010) (finding court could consider nature of relationships and

contacts developed in prior contract to support specific jurisdiction in suit over second contract since relationships in second contract grew out of relationships developed in first contract even though prior contract was a separate legal matter).

The defendant has also attempted to distinguish its participation in drafting "technical" portions of the Circular from marketing ones. But, the Circular is, by definition, a marketing piece. So it is an unnatural exercise to somehow tease out "marketing" provisions from technical ones.

Additionally, the defendant says its involvement is "industry standard":

> I would like to answer a little bit more about for whom I work, just as an explanation in terms of how it works when you are setting up a fund. It is complete industry standard that you are involved in setting up the fund in order to make sure the technical aspects of the fund administration are covered during the setup period . . . that disclosures are made properly, and that we are not mentioned in the documentation as a fund administrator where we should not be mentioned.
>
> So this is industry standard.

(Woehreide Dep. at 56; ee also Dckt. # 36-1 Exhibit F). The Court is not sure how common practice saves it. Simply because the defendant's involvement may be routine does not mean it was not directed at, and in a way reasonably knowing of, South Carolina clients and business. In fact, if repeated enough, routine conduct, might even be characterized as "systematic and continuous," forming the basis for general jurisdiction. The Court can imagine a litany of perfunctory practice and robotic dealings that were they to cause some injury would justify jurisdiction in this State. It is the purposefulness of the availment rather than its complexity that matters.

Likewise, the defendant contends that the plaintiff is not even an investor. Due to

the nature of the investment, only certain exempt entities could invest in the fund, and the plaintiff was merely a beneficiary of Chicago-based Millennium Trust's investment of his IRA in the Offshore Fund. (Def. Ex. B at 4-6). But, personal jurisdiction is not dependent upon the plaintiff being characterized, in the most technical sense, as an investor. As thoroughly discussed, the defendant affirmatively and substantively engaged a South Carolina fund and management. Individuals like the plaintiff, of whatever characterization, were foreseeable clients and victims of wrongful conduct.

Lastly, the Court believes that the exercise of personal jurisdiction is constitutionally reasonable. This prong of the analysis "ensures that litigation is not 'so gravely difficult and inconvenient' as to place the defendant at a 'severe disadvantage in comparison to his opponent.'" *Tire Eng'g & Distribution*, 682 F.3d at 303. The burden on the defendant, interests of the forum state, and the plaintiff's interest in obtaining relief guide the inquiry. *Id*. A corporate defendant's domicile abroad, standing alone, does not render domestic exercise of jurisdiction unduly burdensome. *Id*. The defendant's ability to secure counsel in the forum state and its choice to do business with a forum resident, which also made the prospect of litigation in the state foreseeable, counsels that defending the suit would not be particularly burdensome. *Id*. South Carolina moreover maintains a "substantial interest" in resolving the grievances of its citizens, particularly when South Carolina law informs some of the claims. *Id*.

In sum, the defendant purposefully availed itself of the forum state; the claims in this case arose out of such activities directed at the forum state; and the exercise of personal jurisdiction does not offend constitutional concerns. Specific personal jurisdiction lies.

### B. Forum Selection

The defendant also argues that the case should be dismissed because the Subscription Agreement contains a valid and enforceable mandatory forum selection clause that requires the plaintiff to bring the current claim exclusively in the Cayman Islands. The Subscription Agreement states:

> The parties agree that any action or proceeding arising directly, indirectly, or otherwise, in connection with, out of, related to, or from, this Subscription Agreement, any breach hereof, or any transaction covered hereby, shall be resolved, whether by arbitration or otherwise, exclusively within the Cayman Islands. Accordingly, the parties consent and submit to the exclusive jurisdiction of the courts located within the Cayman Islands. The parties further agree that any such action or proceeding brought by either such party to enforce any right, assert any claim, or obtain any relief whatsoever in connection with this Subscription Agreement shall be commenced by such party exclusively in the Cayman Islands.

Def. Ex. B at 6 ¶ 15(emphasis added).

The Court would say very little. Forum selection clauses are governed by federal law. *See Atl. Floor Servs., Inc. v. Wal-Mart Stores, Inc.*, 334 F. Supp. 2d 875, 877 (D.S.C. 2004); *Scott v. Guardsmark* Sec., 874 F. Supp. 117, 120 (D.S.C.1995). A forum selection clause is *prima facie* valid and enforceable when made in arms-length transactions by sophisticated business entities absent some compelling and countervailing reason. *Atl. Floor Servs.*, 334 F. Supp. 2d at 877. Forum selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10 (1972). Forum selection clauses may be considered unreasonable if:

> (1) their formation was induced by fraud or overreaching; (2) the complaining party "will for all practical purposes be

> deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) their enforcement would contravene a strong public policy of the forum state.

*Id*.

The parties agree that the plaintiff's claims may be more substantively limited and subject to some jeopardy for certain defenses and periods of limitations if he were forced to refile this action in the Caymans.  The defendant contends that this is not fundamental unfairness.  The plaintiff, himself, may have delayed some in prosecuting his rights and, also, has parallel actions in state court to vindicate them.

Nevertheless, the Court is concerned by the additional procedural delay and prejudice, this many years in federal court without resolution.  Having found jurisdiction there seems a grave inconvenience and unfairness that the plaintiff would have to now, after almost three years, gather up his actions, so to speak, and start anew. It will continue here.

### C.     Failure to State A Claim

The Court has reviewed the pleadings and believes the Complaint pleads plausible claims for relief.   The defendant may renew its legal arguments against them at summary judgment.

## II.     Motion to Amend

The plaintiff has moved to amend his Complaint to add certain state securities law claims.  The defendant contends that the amendment is futile because such claims fail as a matter of law.  Under Federal Rule of Civil Procedure 15(a), leave to amend should be freely given absent some stated reason "such as undue delay, bad faith or dilatory motive

on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc." *Red Bird Egg Farms, Inc. v. Pa. Mfrs. Indem. Co.*, No. 00–1149, 2001 WL 878321, at *4 (4th Cir. Aug. 3, 2001); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962)*; Ward Elec. v. First Commercial Bank*, 819 F.2d 496, 497 (4th Cir.1987) ("a change in the theory of recovery and one prior amendment of the complaint [were] not sufficient to justify denial of leave to amend under the principles of *Foman*" absent some resulting prejudice to the opposing party).  In the interest of justice and in accordance with these standards, the plaintiff should be permitted to amend its complaint. *See* Fed. R. Civ. P. 15(a)(1).  The Court has considered the futility of such claims and would wait to consider legal arguments against them after discovery in this case.

As a corollary to its ruling, the plaintiff's motion to strike is denied.

## CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss (ECF No. 36) is DENIED.  The plaintiff's motion to amend (ECF No. 37) is GRANTED.  And, the plaintiff's motion to strike (ECF No. 50) is DENIED.

IT IS SO ORDERED.

s/ Bruce Howe Hendricks
United States District Judge

March 23, 2015
Greenville, South Carolina